UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                       )
**LAJUAN DIXON,**                      )
                                       )
       **Plaintiff,**         )
                                       )
    **v.**                            )   Civil Action No. 13-1992 (RMC)
                                       )
**DISTRICT OF COLUMBIA,**              )
                                       )
       **Defendant.**         )
_____)

## OPINION

Lajuan Dixon filed suit as the parent and next friend of A.D., a minor,[1] seeking injunctive and declaratory relief against the District of Columbia under the Individuals with Disabilities Education Improvement Act of 2004 (IDEA), 20 U.S.C. §§ 1400 *et seq.* Ms. Dixon is appealing a Hearing Officer's Determination and Order rendered in favor of the District of Columbia Public Schools, which found that DCPS did not deny A.D. a free appropriate public education, *see* 20 U.S.C. § 1412(a)(1)(A). The parties have filed cross motions for summary judgment. Because Ms. Dixon offered no evidence at the hearing to support her arguments here, the Court finds that the Hearing Officer's Determination and Order was reasoned and consistent with the evidence and the law. The Court will deny Ms. Dixon's motion for summary judgment and will grant DCPS's motion for summary judgment.

## I. BACKGROUND

### A. Statutory Framework

The IDEA ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to

---

[1] The minor shall be referred to as A.D., pursuant to LCvR 5.4(f)(2).

1

meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). In designing a free appropriate public education (FAPE) for students with disabilities, the child's parents, teachers, school officials, and other professionals collaborate in a "multi-disciplinary team" to develop an individualized educational program (IEP) to meet the child's unique needs. *See id.* § 1414(d)(1)(B). Local school officials utilize the IEP to assess the student's needs and assign a commensurate learning environment. *See id.* § 1414(d)(1)(A).

The statute contains a number of procedural safeguards. Parents of a disabled child must be notified in writing of any proposed change in "the identification, evaluation, or educational placement of the child," and are permitted to challenge any matter relating to such change. *Id.* § 1415(b)(3) & (b)(6). Parents can have their complaints considered in an "impartial due process hearing" before a D.C. Hearing Officer, who issues a determination. *Id.* § 1415(f)(1)(A). If the parent is dissatisfied with the determination, she may appeal to a state court or a federal district court. *Id.* § 1415(i)(2)(A).

### B. Factual Background[2]

A.D. is now a high school student who was found eligible to receive special education services due to his health impairment (epilepsy and poor short term memory) on November 14, 2011. Administrative Record (AR) [Dkt. 9] at 57-58. A.D. attended Prospect

---

[2] The District did not submit a statement of material facts in support of its motion and did not file a response to Plaintiff's Statement of Material Facts, Dkt. 11-2. Local Civil Rule 7(h) requires that each motion for summary judgment "be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue." LCvR 7(h). Further, "[i]n determining a motion for summary judgment, the court may assume the facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *Id*. *Since the District failed to comply with Local Civil Rule 7(h), the Court will treat all paragraphs of Plaintiff's Statement of Material Facts as conceded by the District.*

Learning Center (Prospect) from 2011 to June 2013, lastly as an eighth grader.  A multidisciplinary team (MDT) met for annual reviews of A.D.'s IEP on March 16, 2012 and January 30, 2013 and issued corresponding IEPs.  *Id*. at 68, 80.  Pursuant to the March 2012 and January 2013 IEPs, A.D. received 27.5 hours per week of specialized instruction to address deficits in the areas of reading, math and written language in an outside general-education setting.  *Id*. at 76, 88-89.  A.D. was provided with classroom and statewide assessment accommodations such as "repetition of directions, calculators, preferential seating, extended time on subtests and breaks during a subtest."  AR at 90.  The January 2013 IEP established new annual goals for A.D. and placed A.D. on a high school diploma track.  *Compare id*. at 70-74 *with* 86-87; 91.  IEP progress reports between November 2011 and June 2013 revealed progression but no mastery of any IEP goals.  At the end of the 2013 school year, A.D. received all As and Bs on his report card.

On May 20, 2013, DCPS convened an IEP team meeting (May Meeting) to discuss A.D.'s placement for the 2013-2014 school year and changes to the January 2013 IEP.  DCPS informed Ms. Dixon that Eastern was being offered to Prospect 8th graders and that the number of hours of specialized services A.D. received had to be reduced from 27.5 to 15 hours per week for A.D. to be on the diploma track.  *Id.* at 106.  Ms. Dixon indicated that she was also considering Thurgood Marshall High School and Washington Math Science and Technology Public Charter High School (WMST) as options for A.D.  *Id*.  After speaking with special education coordinators from Thurgood Marshall and WMST, Ms. Dixon stated her intention to enroll A.D. at WMST because he could enlist in the Reserve Officers' Training Corps (ROTC) and play football at Friendship High School.  Ms. Lee, A.D.'s case manager, affirmed Ms.

3

Dixon's right to send A.D. to WMST, but stated that DCPS had to issue the Prior Written Notice[3] to Eastern. *Id.*

That same day, DCPS issued a Prior Written Notice memorializing its decision to reduce the hours of specialized instruction for A.D. in the 2013-2014 school year "in order for the receiving school to design the appropriate specialized instruction for the inclusion/diploma track." *Id*. at 110. The Prior Written Notice indicated that the decision was based on a review of "PIA,[4] SRI score,[5] running record (ELA), weekly testing and classroom observation." *Id*. DCPS issued a subsequent Prior Written Notice dated June 31, 2013 to indicate that A.D. would matriculate to Eastern because Ms. Dixon had "decided to enroll the student at Eastern Senior

---

[3] A Prior Written Notice must be provided to the parent of a child with a disability whenever the local educational agency proposes to initiate a change in the "identification, evaluation or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(3). The Prior Written Notice must include the following information:

> (A) a description of the action proposed . . . by the agency;
> (B) an explanation of why the agency proposes . . . to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;
> (C) a statement that the parents of a child with a disability have protection under the procedural safeguards of [20 U.S.C. § 1415] . . . ;
> (D) sources for parents to contact to obtain assistance in understanding the provisions of [20 U.S.C. § 1415];
> (E) a description of other options considered by the IEP Team and the reason why those options were rejected; and
> (F) a description of the factors that are relevant to the agency's proposal . . . .

*Id*. § 1415(c)(1)(A)-(F).

[4] Dr. Ida Holman, A.D.'s educational advocate, testified that a "PIA" is an informal assessment of a student's skills. *See* AR at 340-341.

[5] Dr. Holman testified that "SRI" is related to a student's reading scores. *See id*. at 338.

High School instead of Washington Math Science and Technology." *Id*. at 143-44. A DCPS letter to Ms. Dixon dated July 12, 2013 confirmed that the location of services to A.D. would be at Eastern and that "no [further] changes to the IEP are being proposed at this time." *Id.* at 166.

As a result of the May Meeting, A.D.'s IEP was amended, reducing the hours of specialized instruction A.D. would receive from 27.5 to 15 hours per weeks so A.D. could "transition to senior high in order to metriculate [sic] in an inclusion model to earn carnegie units to earneda [sic] high school diploma." *Id.* at 117-28 (Amended IEP). The Amended IEP also provided an additional accommodation of reading out loud to A.D. test questions (math, science, and composition) in the classroom and during statewide assessments. *Id*. at 127.

Dissatisfied with the results of the May Meeting and the reduction in A.D.'s hours of specialized instruction, Ms. Dixon filed a Due Process Complaint on July 9, 2013. *See id*. at 147-58. The Due Process Complaint alleges that DCPS denied A.D. a FAPE by changing the student's placement to Eastern High School and "by providing the student with an inappropriate IEP in May of 2013 in order to shoe-horn the student into a placement at Eastern SHS while failing to take into account the student's needs and without justification or supporting data." *Id*. at 151, 154. The Due Process Complaint specifically alleged that the Amended IEP was inappropriate because it reduced the student's hours of specialized instruction without justification or data and "because it contains goals that are aligned with the 8th grade common core standards and are not individualized or based on the needs or current abilities of the student." *Id*. at 155-56.

Following a prehearing conference, the Hearing Officer identified the following two issues for hearing:

> 1. Whether DCPS denied the student a FAPE by failing to develop an appropriate IEP for the student on May 20, 2013,

5

>    specifically reducing the student's specialized instruction from 31 hours per week outside of the general education environment to 15 hours per week of specialized instruction outside of the general education environment and changing the student's placement from a public separate school to a program within a regular public school?
>
> 2. Whether DCPS denied the student a FAPE by failing to develop an appropriate IEP for the student on May 20, 2013, specifically by failing to develop appropriate annual academic goals based on the students' unique needs and present level of performance?

*Id.* at 7. Neither party objected to the Hearing Officer's formulation of the issues.

The due process hearing was held on September 13, 2013. Ms. Dixon testified that a DCPS special education teacher and a DCPS special education coordinator had both told her that Eastern served as the transition school for all eighth graders from Prospect, but that a transition could not be completed without reducing A.D.'s hours of specialized instruction from a full-time setting (27.5 hours) to 15 hours. Ms. Dixon recalled that Eastern's special education coordinator, James Robinson, had been called during the May Meeting, and confirmed that A.D.'s hours of special education needed to be reduced to facilitate his transition and to allow him to attend Eastern on a diploma track. As the meeting notes confirm, *id.* at 106-109, Ms. Dixon testified that no discussions regarding A.D.'s educational needs took place at the May Meeting, no evaluations were reviewed, and no other placements were offered.

In a Hearing Officer's Determination and Order (HOD) dated September 22, 2013, the hearing officer found that DCPS had not denied A.D. a FAPE. *See id.* at 5-17 (HOD). The hearing officer made a number of factual findings, none of which is disputed by the parties.

Ms. Dixon filed suit in this Court challenging the HOD on December 17, 2013. Count I of her Complaint alleges that the "HOD contained legal error [] in determining that shoehorning had not taken place, as the District intentionally reduced A.D.'s IEP to place him in

a lesser restrictive environment." Compl. [Dkt. 1] ¶ 60. Count II alleges that the HOD contained legal error "because the hearing officer failed to determine whether the reduction of hours on A.D.'s IEP had been based on his specific and unique needs" and because the "hearing officer [] determined that [] the May 2013 IEP was appropriate because the goals identified on the IEP were reasonably calculated to confer educational benefit." *Id*. ¶ 65, 68. The parties cross-moved for summary judgment.

## II. LEGAL STANDARD

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## B. IDEA

In cases under IDEA, a district court "shall review the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The burden of proof is with the party challenging the administrative determination, who must "'at least take on the burden of persuading the court that the hearing officer was wrong.'" *Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)). The court gives "due weight" to the HOD and does not substitute its own view of sound educational policy for that of the hearing officer. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982). "However, less deference is to be accorded to the hearing officer's decision than would be the case at a conventional administrative proceeding." *Stanton ex rel. K.T. v. D.C.*, 680 F. Supp. 2d 201, 205 (D.D.C. 2010) (citing *Reid*, 401 F.3d at 521). Specifically, a hearing officer's "decision without reasoned and specific findings deserves little deference." *Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991) (internal quotation marks omitted).

If neither party requests that the court hear additional evidence, then the court may determine the case based on the administrative record on summary judgment. *D.K. v. District of Columbia*, 983 F. Supp. 2d 138, 144 (D.D.C. 2013). Here, neither party has requested that the Court hear additional evidence. The Court finds the record sufficient, and, thus, the Court bases its decision on a review of the administrative record and the briefs and arguments here.

## III.  ANALYSIS

Ms. Dixon complains that DCPS decided to place A.D. at Eastern before the May Meeting and that the May Meeting merely confirmed that prior decision, without discussion or regard to A.D.'s real needs.  DCPS argues that it relied on legitimate school records in making its placement decision and that the reduction in hours of weekly special education was well supported by A.D.'s educational performance and the full record.

### A.  Count I – Predetermination of A.D.'s Placement at Eastern

Ms. Dixon argues that the hearing officer erred in determining that shoehorning had not taken place when the District reduced A.D.'s special education hours to place him at Eastern.  DCPS argues that Count I must be dismissed because "shoehorning" is not a cognizable claim under the IDEA.  Ms. Dixon clearly describes her shoehorning theory as predetermination, *i.e.*, that DCPS first determined A.D.'s placement at Eastern and then changed his IEP for the sole purpose of accommodating that placement.  *See* Pl. Mot. for Summ. J. [Dkt. 11-1] (Pl. Mot.) at 6-7.  Predetermination of school placement constitutes a procedural violation of IDEA.  *See Deal v. Hamilton County Bd. Of Educ.*, 392 F.3d 840, 857 (6th Cir. 2004) (citing *Spielberg ex rel. Spielberg v. Henrico County Pub. Schs.*, 853 F.2d 256 (4th Cir. 1988)).

Nonetheless, Ms. Dixon's argument suffers from a fundamental problem: the Hearing Officer did not certify the question of whether DCPS had committed a procedural violation of IDEA as an issue for the due process hearing.  *See* AR at 7.  The Hearing Officer certified the following two issues for the due process hearing—without objection from Ms. Dixon:

> 1. Whether DCPS denied the student a FAPE by failing to develop an appropriate IEP for the student on May 20, 2013, specifically reducing the student's specialized instruction from 31 hours per week outside of the general education environment to 15 hours per week of specialized instruction

9

> outside of the general education environment and changing the student's placement from a public separate school to a program within a regular public school?
>
> 2. Whether DCPS denied the student a FAPE by failing to develop an appropriate IEP for the student on May 20, 2013, specifically by failing to develop appropriate annual academic goals based on the students' unique needs and present level of performance?

*Id*. at 7. Neither issue concerns the alleged procedural violation claimed by Ms. Dixon. Ms. Dixon insists that the Hearing Officer's mere "rephrasing of the issues . . . did not change the arguments the Plaintiff[] sought to litigate." Pl. Opp'n [Dkt. 15] at 7. Ms. Dixon argues that she has consistently maintained "throughout the underlying administrative case and throughout this case" that DCPS engaged in "shoehorning." *Id*. at 5. While it is apparent from the record that Ms. Dixon consistently argued her shoehorning theory, the question of whether DCPS predetermined A.D.'s new placement is quite distinct from whether DCPS denied A.D. a FAPE by changes to his IEP.

Even if the predetermination claim had been presented at the due process hearing, the argument would still fall short. Ms. Dixon asserts that a procedural violation by itself amounts to a denial of FAPE and entitles her to a range of corrective remedies. This is not an accurate statement of the law. "[A]n IDEA claim is viable only if those procedural violations affected the student's *substantive rights*." *Lesesne v. District of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006). *See also C.M. v. Bd. of Educ. of Union Cnty. Reg'l High Sch. Dist.*, 128 F. App'x 876, 881 (3d Cir. 2005) ("[O]nly those procedural violations of the IDEA which result in loss of educational opportunity or seriously deprive parents of their participation rights are actionable."); *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 534 (4th Cir. 2002) ("If a disabled child received (or was offered) a FAPE in spite of a technical violation of the IDEA, the school district has fulfilled its statutory obligations.").

Ms. Dixon bears the burden of proving a violation of A.D.'s substantive educational rights. *See Holdzclaw v. District of Columbia*, 524 F. Supp. 2d 43, 48 (D.D.C. 2007); *Kruvant v. District of Columbia*, 99 Fed. Appx. 232, 233 (D.C. Cir. 2004). She does not satisfy this obligation: she fails to establish that A.D. was *harmed* by his placement at Eastern and the reduction in hours of specialized instruction.[6] *See Kruvant*, 99 Fed. Appx. at 233 (plaintiff must show harm to student resulting from procedural error). Ms. Dixon presented no evidence demonstrating that A.D. required 27.5 hours per week of specialized instruction and that 15 hours was insufficient. At the due process hearing, Ms. Dixon offered no testimony as to how A.D. is faring at Eastern under the Amended IEP; her testimony was limited to her beliefs about the purpose of the May Meeting and the subjects discussed. *See* AR at 300-319. Ms. Dixon's two other witnesses spoke only to the relief she requests. Neither testified about the appropriateness of A.D.'s schooling at Eastern or the effect of reduced hours of specialized instruction. *See id*. at 325- 356, 360-379.

Ms. Dixon's claim that DCPS predetermined A.D.'s placement, even if properly presented to the hearing officer, does not make out a claim on which relief can be granted because it totally lacks evidentiary support that A.D.'s substantive rights were affected.[7] Therefore, summary judgment will be granted in favor of the District on Count I.

---

[6] Ms. Dixon argues that her participation rights were impeded, but not that she was seriously deprived of her rights. Moreover, this issue was not raised before the hearing officer and cannot be considered in the first instance in this Court. *See Cox v. Jenkins*, 878 F.2d 414, 419-20 (D.C. Cir. 1989).

[7] As has the Court, the hearing officer nonetheless addressed this issue and concluded that "[e]ven if DCPS committed a procedural violation in preparation for or during the student's May 20, 2013 IEP Team meeting, the procedural violation did not impede the child's right to a FAPE, significantly impede the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child or cause a deprivation of educational benefit." AR at 15.

### B. Count II – Suitability of the Amended IEP

1. Allegations Regarding the Reduction in Hours of Specialized Instruction

Ms. Dixon claims that the Amended IEP was inappropriate because it reduced A.D.'s specialized instruction services from 27.5 hours to 15 hours each week. The Hearing Officer heard and rejected this argument, finding that the Amended IEP "reflected the results of the student's evaluations and . . . provid[ed] classroom and testing accommodations to address the student's distractibility," even though no data was reviewed during the May Meeting. *Id.* at 13.

An IEP must be "reasonably calculated" to confer educational benefits on the child, but need not "maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children." *Rowley,* 458 U.S. at 200. Accordingly, an IEP is appropriate when it "enable[s] the child to achieve passing marks and advance from grade to grade" in the "least restrictive environment" possible. *See K.S. v. District of Columbia,* 962 F. Supp. 2d 216, 220 (D.D.C. 2013).

Here, A.D.'s January 2013 IEP and Amended IEP from the May Meeting contain essentially the same classroom accommodations, except that the Amended IEP provides for the additional accommodation of reading test questions to A.D. in the classroom and statewide assessments. *Compare* AR at 90 with AR at 127. The Amended IEP, however, provided 15 hours of specialized instruction each week, whereas the January 2013 IEP provided 27.5 hours of specialized instruction each week.

Ms. Dixon has not met her burden of proof by presenting evidence to show that the Amended IEP failed to confer an educational benefit on A.D. None of her witnesses testified to the appropriateness of the Amended IEP and she produced no other evidence demonstrating that 15 hours per week of specialized instruction is not sufficient to confer an educational benefit

on A.D.  Without evidence, the Court has no basis to overturn the Hearing Officer's determination on this point.

        2.    Allegations Regarding the Appropriateness of the Annual Goals

Ms. Dixon complains that the annual goals formulated in the Amended IEP were not appropriate for A.D. because they were based on eighth-grade common goals and not on his individual needs.  The District responds that the Hearing Office did not err because A.D.'s levels of academic achievement and functional performance supported the use of the eighth grade common goals.  An IEP must include a "statement of measurable annual goals, including academic and functional goals designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and meet each of the child's other educational needs that result from the child's disability."  34 C.F.R. § 300.320.(a)(2)(i).

Neither party recognizes that the annual goals in contention were adopted in January 2013 for the purpose of formulating A.D.'s January 2013 IEP and were left unchanged by the Amended IEP in May 2013.  AR at 9.  Although A.D.'s IEP Team must review his IEP periodically to determine progress against his annual goals, it is not obligated to conduct this review more than once a year.  *See* 34 C.F.R. § 300.324(b)(1)(i) ("Each public agency must ensure that . . . the IEP Team reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved.").  Because DCPS established A.D.'s annual goals at the annual IEP Team meeting held in January 2013, DCPS had no statutory obligation to review or revise the annual goals at the May Meeting (and, in fact, did not).

Moreover, DCPS convened the May Meeting for the purposes of determining A.D.'s high school placement after Prospect and reducing his hours of specialized instruction.

Because an IEP Team may tailor revisions to an IEP based on changes in circumstances, such as relocation, the May Meeting did not trigger an obligation to conduct a wholesale review of A.D.'s IEP. *See id*. § 300.324(b)(ii)(D)-(E) (The IEP Team must "revise[] the IEP, *as appropriate*, to address . . . [t]he child's anticipated needs; or [o]ther matters.") (emphasis added).

The hearing officer noted that the Amended IEP contained identical annual goals to the January 2013 IEP and that A.D.'s annual goals were not discussed at the May Meeting. AR at 15. The hearing officer concluded the annual goals were appropriate based on the record presented at the due process hearing. The hearing officer reviewed A.D.'s annual goals in the areas of mathematics, reading and written expression and, with respect to each goal, concluded that "there was no evidence presented" that the identified skills "cannot be achieved by students functioning at the academic level as this student or are not based on the student's unique needs." *See* AR at 15-16.

Ms. Dixon contends that A.D.'s annual goals were not tailored to his particular needs because DCPS relied on the Common Core Standards, its general education curriculum, to formulate A.D.'s annual goals. The hearing officer rejected this argument:

> Developing IEP goals with the Common Core Standards as a guide helps to enable an LEA [local education agency] to ensure that the student will be involved in and make progress in the general education curriculum. Here, DCPS may have used the Common Core Standards as a guide to develop the student's annual goals however there was no evidence presented which suggested that the annual goals on the student's May 20, 2013 IEP were inappropriate for the student or not based on the student's unique needs and present level of performance.

*Id*. at 16. The Court agrees with the hearing officer's analysis. Although Ms. Dixon complains that the annual goals were based on "out of date data," Pl. Mot. at 12, the IEP Progress Report

dated April 11, 2013 shows that A.D. was progressing in all of his IEP goals and objectives.  AR at 97-100.

Ms. Dixon argues only in conclusory fashion that the annual goals were not based on A.D.'s specific and unique needs.  She points to no evidence in the record to show the hearing officer erred or that the annual goals were not reasonably calculated to confer an education benefit on A.D.  "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003).  Based on a complete review of the record, and accounting for the measured deference to be accorded to the hearing officer, *see Rowley*, 458 U.S. at 206, the Court concludes that the hearing officer did not err on this point.  Summary judgment will be granted to the District on Count II.

## IV.  CONCLUSION

For the reasons stated above, the Court will deny Ms. Dixon's motion for summary judgment [Dkt. 11] and grant the District's cross motion for summary judgment [Dkt. 12].  Judgment will be entered in favor of the District.  A memorializing Order accompanies this Opinion.

Date: March 18, 2015

                                                                 /s/
                                        ROSEMARY M. COLLYER
                                        United States District Judge